[No. A034516. First Dist., Div. One. Nov. 19, 1987.]

ROY GUINNANE et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants
and Respondents.

COUNSEL

Charles O. Morgan, Jr., and Paul Kleven for Plaintiffs and Appellants.

Louise H. Renne, City Attorney, and Andrew W. Schwartz, Deputy City Attorney, for Defendants and Respondents.

OPINION

RACANELLI, P. J.—Plaintiffs and appellants,[1] real estate developers, brought an inverse condemnation action against defendants on a theory that the city's conduct in delaying action on a building permit application to construct four single-family houses on four adjoining lots, pending environmental review, was so unreasonable as to amount to a taking without just compensation. Following an order granting summary judgment in favor of the city, plaintiff appeals.

### Factual Background

In 1979, plaintiff Roy Guinnane purchased four vacant lots located on Edgehill Way in San Francisco. In July 1980, the recreation and parks commission and the planning commission, acting jointly, designated an area known as "Edgehill Woods," which included plaintiff's lots, for study for

---

[1] Since the interests of plaintiffs and appellants are identical, we will refer to them hereafter in the singular for convenience.

possible acquisition as a city park. Accordingly, Edgehill Woods was included in the recreation and open space element of the city's master plan.

In September 1980, plaintiff filed an application for a building permit. The "environmental evaluation" submitted with the permit application revealed plaintiff's intent to build four single-family houses on the lots. After an initial study, the city's planning department concluded the construction might have significant environmental effects and required an environmental impact report (EIR).[2] Thereafter, plaintiff hired a consultant to prepare a preliminary draft EIR, which ultimately was submitted in September 1981.

In October 1981, after a year-long study, the recreation and parks commission and the planning commission decided to acquire only a portion of Edgehill Woods; the area to be acquired did not include plaintiff's lots.

In December 1981, the planning commission amended the master plan to allow construction projects on lots which were not to be acquired. On January 14, 1982, the planning commission rescinded its requirement of an EIR for plaintiff's proposed development.

The planning commission's rescission of the EIR requirement for plaintiff's proposed development was conditioned upon another initial study. Following the initial study, the planning department concluded an EIR was not required but that a negative declaration was indicated. In that regard, the planning department requested plaintiff to submit certain information in support of the negative declaration. However, plaintiff failed to submit all of the requested information until more than *three years later* in September 1985.

On October 18, 1985, the city issued a negative declaration, amended in November in response to public comments.

Meanwhile, plaintiff filed his lawsuit in 1982, long before the city's environmental review was completed in November 1985. Due to plaintiff's failure to submit the requested data, plaintiff's building permit application had been cancelled in 1983. On December 30, 1985, plaintiff filed a new application. At the time city's motion for summary judgment came on for hearing (Feb. 1986), plaintiff's new building permit application had not yet been acted upon.

---

[2] The planning commission upheld the decision of the planning department on plaintiff's administrative appeal.

*Discussion*

## I.

It has long been established that inverse condemnation is not limited to a direct physical invasion. A "taking" may occur when a land use regulation "goes too far." (*Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 326, 43 S.Ct. 158, 28 A.L.R. 1321].) At the time of the proceedings below, California law declared that a landowner could not maintain a suit for *damages* resulting from a regulatory taking; that the landowner's remedy was limited to an action for mandamus or declaratory relief to invalidate and remove the challenged regulation. (*Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, affd. 447 U.S. 255 [65 L.ED.2d 106, 100 S.Ct. 2138].)

Given that settled law, plaintiff could not, and did not, assert a regulatory taking. Instead, plaintiff sought to rely on the rule announced in *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345], that a landowner may recover damages for unreasonable precondemnation activities. Such reliance was wholly misplaced.

In *Klopping,* the city first initiated eminent domain proceedings against plaintiffs' property, then dismissed the action announcing its intention to condemn the property in the future. Plaintiffs sued in inverse condemnation alleging that as a result of the city's announced intention, a cloud was placed over the property resulting in loss of rentals and diminution of the value of the property. The *Klopping* court held that under such circumstances the landowners could maintain an action for inverse condemnation compelling the city to proceed with its announced intention to condemn and to pay the landowners the market value of the property *before* the cloud was created and the value declined. (8 Cal.3d at p. 52.)

Plaintiff seems to suggest that city's delay in acting upon his application constituted unreasonable precondemnation activities. But plaintiff overlooks a fundamental distinction between this case and *Klopping*: unlike *Klopping,* there was never any announcement by the city of an intention to condemn plaintiff's property. At most, the property was properly designated as open space within the master plan, to be *studied* for *possible* acquisition as a public park.

Of course, a planning designation is not the functional equivalent of an announced intent to condemn. Thus, in *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111], the court held that a general plan designation of plaintiff's property as a street did not give rise to an action for inverse condemnation. "The plan is by its

very nature merely tentative and subject to change. Whether eventually any part of plaintiff's land will be taken for a street depends upon unpredictable future events. If the plan is implemented by the county in the future in such manner as actually to affect plaintiff's free use of his property, the validity of the county's action may be challenged at that time." (*Id.,* at p. 118.)

The *Selby* court noted the basic difference from *Klopping* in concluding that the adoption of a general plan is "several leagues short of a firm declaration of an intention to condemn property." (*Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d at p. 119.) Moreover, the court reasoned, "If a governmental entity and its responsible officials were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential public use on one of these several authorized plans, the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land." (*Id.,* at pp. 120-121; see also *Cambria Spring Co.* v. *City of Pico Rivera* (1985) 171 Cal.App.3d 1080, 1097-1098 [217 Cal.Rptr. 772] [adoption of redevelopment plan]; *Dale* v. *City of Mountain View* (1976) 55 Cal.App.3d 101, 107 [127 Cal.Rptr. 520] [amendment to general plan to restrict use of property to open space]; *Navajo Terminals, Inc.* v. *San Francisco Bay Conservation etc. Com.* (1975) 46 Cal.App. 3d 1 [120 Cal.Rptr. 108] [adoption of resolution establishing property as a park].)

In the present case, we are likewise compelled to conclude that the city's designation of plaintiff's property as a site to be studied for possible acquisition as a public park did not amount to an announced intention to condemn so as to justify an action in inverse condemnation.

## II.

After the briefs were filed in the present case, the United States Supreme Court decided *First English Evangelical Lutheran Church of Glendale* v. *Los Angeles County* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378] (hereafter *First English*). In that case the Supreme Court overruled the California Supreme Court's decision in *Agins* v. *City of Tiburon, supra,* 24 Cal.3d 266, and held damages were recoverable for a regulatory taking even if the taking is temporary. ■ In a supplemental brief filed with this court, plaintiff now argues that he need no longer rely on *Klopping* for his claim for damages and bases his claim for damages on the traditional theory of a regulatory taking as discussed in *First English*. Our analysis of such alternate theory of recovery yields a result unfavorable to plaintiff.

Although the Supreme Court has determined that a temporary regulatory taking is compensable, there is nothing in *First English* which changes the rule that a "taking" must occur before compensation may be claimed. In *First English,* the court *assumed* a taking had occurred. On the appeal from the trial court's order striking a portion of the complaint, the lower court and the Supreme Court *accepted as true* the allegation that the county's ordinance denied the landowner *all* use of the property. Thus, the court framed the issue before it as "whether abandonment by the government requires payment of compensation for the period of time during which regulations deny a landowner *all use* of his land." (*First English, supra,* 482 U.S. at p. 318 [96 L.Ed.2d at p. 265, 107 S.Ct. at p. 2387], italics added.) The court remanded the matter for further proceedings on whether a regulatory taking had actually occurred: "whether the ordinance at issue actually denied appellant all use of its property or whether the county might avoid the conclusion that a compensable taking had occurred by establishing that the denial of all use was insulated as a part of the State's authority to enact safety regulations." (*Id.,* at p. 313 [96 L.Ed.2d at p. 262, 107 S.Ct. at pp. 2384-2385].)

Here, in contrast, plaintiff did not establish that a taking occurred. The United States Supreme Court has never developed a "set formula to determine where regulation ends and taking begins." (*Goldblatt* v. *Hempstead* (1962) 369 U.S. 590, 594 [8 L.Ed.2d 130, 134, 82 S.Ct. 987].) When, as here, the claim is made that the regulation has significantly diminished the property value,[3] the focus of the inquiry is on the uses of the property which remain. (*Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 131 [57 L.Ed.2d 631, 652-653, 98 S.Ct. 2646].) Plaintiff cannot contend he was denied *all* use of his property. He was neither deprived of his right to exclude others from his land nor denied the right to sell the property. Moreover, the record does not show whether any final action has been taken on his building permit application filed in December 1985. As earlier noted, no action had been taken by the city as of the time the summary judgment motion was heard. Consequently, plaintiff's assertion that he has been denied the right to develop the property is premature.[4] (*Williamson Planning Comm'n* v. *Hamilton Bank* (1985) 473 U.S. 172, 186-191 [87 L.Ed.2d 126,

---

[3] The record discloses that plaintiff purchased the property for $210,000 and claims it is now valueless. However, plaintiff's expert appraiser valued the land at $1.5 million on the assumption it could be developed.

[4] The denial of plaintiff's application to build four five-bedroom, five-bath houses of 6,000 square feet each, if it has occurred, does not constitute a denial of all use of the land. The denial of an ability to exploit a property interest heretofore believed available for development is not a taking. (*Penn Central Transp. Co.* v. *New York City, supra,* 438 U.S. at p. 130 [57 L.Ed.2d at p. 652].) We are informed that during the pendency of this appeal, the city in fact did deny plaintiff's application. If he believes the denial was arbitrary or unreasonable, plaintiff could elect to seek administrative mandamus relief.

138-142, 105 S.Ct. 3108]; see also *MacDonald, Sommer & Frates* v. *Yolo County* (1986) 477 U.S. 340, 348-351 [91 L.Ed.2d 285, 294-296, 106 S.Ct. 2561, 2566].) In such circumstances, plaintiff could not allege and prove a permanent taking of his property.

In any event, since the city decided *not* to acquire plaintiff's property for a public purpose, the "cloud" on the property was eventually removed. Insofar as plaintiff argues that he suffered a temporary taking during the city's study period, his theory is still unsound. There is no showing that the delay in the city's processing of plaintiff's permit application was anything more than the normal period of time for governmental decisionmaking. Such an interim delay does not constitute a temporary taking.

We are guided by two high court decisions. First, in *Agins* v. *Tiburon* (1980) 447 U.S. 255, the city downzoned the plaintiffs' property, restricting the number of allowable residential dwellings. Before rezoning plaintiffs' property, the city had undertaken studies which recommended acquisition of plaintiffs' land for open space. After the rezoning, the city filed an eminent domain proceeding but eventually abandoned it. The plaintiffs' inverse condemnation theory of suit was rejected by the California Supreme Court. (*Agins* v. *City of Tiburon, supra,* 24 Cal.3d at p. 278.) And that determination was later upheld by the United States Supreme Court: "The State Supreme Court correctly rejected the contention that the municipality's good-faith planning activities, which did not result in successful prosecution of an eminent domain claim, so burdened the appellants' enjoyment of their property as to constitute a taking. See also *City of Walnut Creek* v. *Leadership Housing Systems, Inc.,* 73 Cal. App. 3d 611, 620-624, 140 Cal. Rptr. 690, 695-697 (1977). Even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property when the proceedings ended. *Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.'* [Citations.]" (*Agins* v. *Tiburon, supra,* 447, U.S. 255, 263, fn. 9 [65 L.Ed.2d 106, 113], italics added.)

Although the United States Supreme Court in *First English* has now overruled the California Supreme Court's *Agins* decision on another point, there is nothing in *First English* which alters the established principle that the interim burden imposed on a landowner during the government's decisionmaking process, absent unreasonable delay, does not constitute a taking.

Indeed, the *First English* court distinguished *Agins* v. *Tiburon, supra,* 447 U.S. 255, 263 [65 L.Ed.2d 106, 113-114], on the ground that in contrast to

the ordinance in *First English* which prohibited *all* building, "the preliminary activity [in *Agins*] did not work a taking." The *First English* court emphasized that the taking in the case before it was "quite different" (482 U.S. at p. 311 [96 L.Ed.2d at p. 261, 107 S.Ct. at p. 2384]) from the situation involving "normal delays in obtaining building permits . . . ." (*Id.,* at p. 321 [96 L.Ed.2d at p. 268, 107 S.Ct. at p. 2389].)

We therefore discern from *Agins* and *First English* that the temporary suspension of land use which occurs during the normal governmental decisionmaking process does not constitute a taking. Accordingly, the interim delay which occurred herein while the city studied the possible acquisition of plaintiff's property as an open space area did not constitute a compensable taking.

## III.

■ Plaintiff also asserts, however, that the city's delay in acting upon his application was not "normal," but rather excessive and unreasonable.[5] The argument finds no support in the record. Indeed, as the city correctly points out, any excessive delay was attributable solely to plaintiff's own conduct and inaction. Any delay attributable to the city was both reasonable and incidental.[6]

In short, the delays encountered in acting upon the permit application were directly attributable to plaintiff. The time attributable to the city's routine processing of the application cannot be described as either excessive or unreasonable.

---

[5] Not surprisingly, plaintiff does not contend that the city acted improperly in undertaking an environmental review before acting upon his building permit application. Under CEQA, the city's environmental review procedures were mandatory. (Pub. Resources Code, § 21000 et seq.)

[6] We recite the salient sequence of events: On September 4, 1980, plaintiff filed his building permit application; in November 1980, the city completed its initial environmental study and concluded the project may have a significant environmental impact; in April 1981, five months after the city requested an EIR, plaintiff's consultant first met to confer with city officials.

In September 1981, plaintiff submitted a preliminary draft EIR; in January 1982, the planning commission rescinded the EIR requirement pending another initial study.

In March 1982, the planning department completed its study and concluded that only a negative declaration would be required; the planning department then requested plaintiff to furnish data to enable the city to complete the negative declaration, including an analysis of the cumulative impact of hillside development, a site survey showing the trees to be removed, a report on fire-fighting problems, a soil test relating to problems of landsliding and a transportation analysis. Notwithstanding city's repeated requests for the essential information, some three and one-half years expired before plaintiff submitted the final item of information (the site survey) in September 1985. The following month, city issued the negative declaration.

■   Finally, we reject plaintiff's argument that the issue of unreasonable delay should not have been decided on a motion for summary judgment. The material facts were undisputed. The only question was whether the city's conduct constituted "normal" as opposed to "excessive" delay in the processing of plaintiff's permit application. That question became one of law properly decided in a summary judgment proceeding. (See *Angelus Chevrolet* v. *State of California* (1981) 115 Cal.App.3d 995; *County of Los Angeles* v. *Security Ins. Co.* (1975) 52 Cal.App.3d 808.)

The judgment is affirmed.

Newsom, J., and Holmdahl, J., concurred.